# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE COVIDIEN PLC SECURITIES LITIGATION | CASE NO. 1:14-CV-12949-LTS |

## LEAD PLAINTIFF'S REPLY IN FURTHER SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, CLASS CERTIFICATION, AND AWARD OF ATTORNEYS' FEES AND EXPENSES

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................... 3

   I.   The Winona A. Crist Objection ........................................................................ 3

     A.   The Settlement Should be Approved Because the Supplemental Disclosures Provided a Material Benefit to Covidien's Former Shareholders ........................................................ 3

       1)   The Tax Inversion Supplemental Disclosures and Goldman Supplemental Letter .. 3

       2)   The Goldman Supplemental Disclosures ................................................................. 8

     B.   The Supplemental Disclosures Provided a Material Benefit to Covidien's Shareholders and Serve as Sufficient Consideration for the Settlement Under Irish Law ... 10

     C.   The Release Satisfies Due Process and is Sufficiently Narrow to Justify the Claims Being Released .......................................................................................................................... 13

     D.   The PSLRA and Irish Law Provide for an Award of Attorneys' Fees ...................... 17

     E.   Crist, her Husband and Their Attorney, Joseph Christensen, are Serial Objectors that Come to Court with Ulterior Motives .................................................................................... 24

   II.   The Bruce McLanahan Objection ................................................................. 27

   III.   The Graham Newhouse Objection ............................................................... 30

CONCLUSION ..................................................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**

*In re Dataproducts Corp. S'holders Litig.*, C.A. No. 11164, 1991 WL 165301 (Del. Ch. Aug. 22, 1991) ............................................................................................................................. 30

*Allen v. Hyatt*
(1914) 30 T.L.R. 444 (P.C.)................................................................................................ 10

*Barnes v. FleetBoston Fin. Corp.*,
2006 U.S. Dist. LEXIS 71072 (D. Mass. Aug. 22, 2006)................................................. 26

*Bussie v. Allmerica Fin. Corp.*,
50 F. Supp. 2d 59 (D. Mass. 1999) .................................................................................... 26

*Coleman v. Myers*
[1977] 2 N.Z.L.R. 298 (C.A.) ........................................................................................... 11

*Cooke v. Equal* Energy, No. 5:14-cv-00087-C, slip op. (W.D. Ok April 8, 2015)...................... 20

*Cotton v. Hinton*,
559 F.2d 1326 (5th Cir. 1977) ........................................................................................... 26

*Crindle Investments, Roche and Roche v. Wymes*, Woods, Bula Holdings and Bula Ltd.
81, Keane J. (PC) ............................................................................................................... 11

*Daniels v. Daniels*
(1978 Ch 406) .................................................................................................................... 13

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993)................................................. 10

*Davis v. Cent. Vt. Pub. Serv. Corp.*, 2012 U.S. Dist. LEXIS 139186 (D. Vt. Sept. 27, 2012)..... 19

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)........................................................................................................... 15

*Eisenberg v. Chicago Milwaukee Corp.*,
C.A. No. 9374, 1988 Del. Ch. LEXIS 141 (Del. Ch. Oct. 25, 1988) ............................... 19

*Electronic Specialty Co. v. International Controls Corp.*,
2d Cir., 409 F.2d 937 (1969).............................................................................................. 30

*Flynn v Breccia*
[2015] IEHC 547 (August 13, 2015,) ................................................................................ 11

*Fountain v. Avondale Indus.*,
No. 95-1198, 1996 U.S. Dist. LEXIS 5045 (E.D. La. Apr. 18, 1996)................................ 20

*Hensley v. Eckerhart*,
461 U.S. 424 (1983)........................................................................................................... 18

In re Activision Blizzard, Inc. S'holder Litig., 2015 Del. Ch. LEXIS 140 (Del. Ch. May 20, 2015) .................................................................................................................................. 14

*In re AXA Fin., Inc. S'holders Litig.*, No. 18268, 2002 WL 1283674  (Del. Ch. May 22, 2002) 20

*In re Celexa and Lexapro Marketing and Sales Practices Litigation*,
MDL No. 09-2067-NMG, 2014 WL 2547543 (D. Mass. 2014)........................................ 27

*In re Cox Communs., Inc. S'holders Litig.*,
879 A.2d 604 (Del. Ch. 2005)........................................................................................... 14

*In re Crestwood Midstream Partners Unitholder Litig.*,
 No. 4:13-cv-01528, slip op. (S.D. Tex. May 16, 2014) .......................................... 21
*In re GenOn Energy, Inc. Shareholders Litig.*,
 C.A. No. 7721-VCN (TRANSCRIPT) (Del. Ct. Ch. June 24, 2013) ...................................... 24
*In re Genzyme Corp. S'holder Litig.*,
 2011 U.S. Dist. LEXIS 113351 (D. Mass. Sept. 13, 2011) .................................. 19, 21, 22, 23
*In re Initial Pub. Offering Sec. Litig.*,
 728 F. Supp. 2d 289 (S.D.N.Y. 2010) ................................................................ 26
*In re Lupron Marketing and Sales Practices Litigation*,
 No. MDL 1430, Civ. A. 01-10861-RGS, 2005 WL 613492 (D. Mass. 2005) ....................... 27
*In re MetroCorp Bancshares, Inc. S'holders Litig.*,
 No. 4:13-cv-03198, slip op. (S.D. Tex. Oct. 23, 2014) ........................................... 20
*In re QR Energy LP Unitholder Litig.*, No. 4:14-cv-02195, slip op. (S.D. Tex. September 6,
 2015) ................................................................................................... 20
*In re Riverbed Tech., Inc. S'holder Litig.*, Consol. C.A. 10484-VCG (Del. Ct. Ch. July 27, 2015)
 ........................................................................................................... 25
In re Rural/Metro Corp. S'holders Litig., C.A. No. 6350-VCL (TRANSCRIPT) (Del. Ch. Jan. 17,
 2012) .................................................................................................. 14
*In re Schering-Plough/Merck Merger Litig.*,
 2010 U.S. Dist. LEXIS 29121 (D.N.J. Mar. 25, 2010) ............................................. 20
*In re TWA, Inc. S'holders Litig.*,
 No. 9844, 1988 Del. Ch. LEXIS 139 (Del. Ch. Oct. 21, 1988) .................................... 6
*In re Volkswagen and Audi Warranty Extension Litig.*,
 692 F.3d 4 (1st Cir. 2012) ........................................................................... 22
*Int'l Precious Metals Corp. v. Waters*,
 530 U.S. 1223 (2000) ................................................................................. 21
*Krieger v. Atheros Communs., Inc.*, 2012 U.S. Dist. LEXIS 74214 (N.D. Cal. May 29, 2012) .. 20
*Lonardo v. Travelers Indem. Co.*,
 706 F. Supp. 2d 766 (N.D. Ohio 2010) ............................................................. 21
*Louisiana Municipal Police Employees Retirement Sys. v. Cooper Indus. plc, et al.*, 2012 U.S.
 Dist. LEXIS 148542 (N.D. Oh. Oct. 16, 2012) ..................................................... 16
*Martin Marietta Corp. v. Bendix Corp.*, Del.Ch., C.A. 6942, Brown, C. (Sept. 19, 1982) .......... 30
*Martin v. F.S. Payne Co.*,
 409 Mass. 753 (1991) ................................................................................ 22
*Masters v. Wilhelmina Model Agency, Inc.*,
 473 F.3d 423 (2d Cir. 2007) .......................................................................... 21
*McDermott, Inc. v. Wheelabrator-Frye, Inc.*, 649 F.2d 489 (7th Cir. 1980) ........................ 30
*Merola v. Atlantic Richfield Co.*,
 515 F.2d 165 (3d Cir. 1975) ......................................................................... 19
*Mills v. Electric Auto-Lite Co.*,
 396 U.S. 375 (1970) ............................................................................. 18, 19, 20, 22
*Mostaed v. Crawford*,
 Civil Action No. 3:11-cv-00079-JAG, 2012 WL 3947978 (E.D. Va. Sept. 10, 2012)............. 21

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) .......................................... 28

*Nicholson File Co. v. H.K. Porter*, D.R.I., 341 F.Supp. 508 (1972) .......................................... 30

*Nichting v. DPL, Inc.*,
    No. 3:11-cv-141 (S.D. Ohio Feb. 24, 2012) ...................................................................... 21

*O'Keefe v. Mercedes–Benz USA, LLC*,
    214 F.R.D. 266 (E.D. Pa. 2003) ........................................................................................ 26

*O'Malley v. Boris*,
    742 A.2d 845 (Del. 1999) .................................................................................................... 6

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982) .................................. 18

*Pabst Brewing Co. v. Kalmanovitz*,
    551 F. Supp. 882 (D. Del. 1982) ...................................................................................... 30

*Pena Crespo v. Puerto Rico*,
    408 F.3d 10 (1st Cir. 2005) ................................................................................................ 10

*Remedies of Minority S'holders, Scottish Co-Operative Wholesale Society Ltd. v. Meyer and*
    *Anor*,
    Sydney L. Rev., at 567-571 ................................................................................................ 13

*Rolland v. Cellucci*,
    191 F.R.D. 3 (D. Mass. 2000) ........................................................................................... 26

*Scottish Wholesale Co-Operative Society v Meyer*
    [1959] AC234 ..................................................................................................................... 13

*Sealy Mattress Co. v. Sealy, Inc.*,
    532 A.2d 1324 (Del. Ch. 1987) ........................................................................................... 6

*Shaev v. Sidhu*,
    No. 0983, 2009 Phila Ct. Com. Pl. LEXIS 63 (Pa. Ct. C.P. Mar. 5, 2009) ........................... 24

*Smallwood v. Pearl Brewing Co.*,
    489 F.2d 579 (5th Cir. 1974) ............................................................................................... 6

*Tandycrafts, Inc. v. Initio Partners*,
    562 A.2d 1162 (Del. 1989) ................................................................................................ 19

*TSC Indus.v. Northway, Inc.*,
    426 U.S. 438 (1976) ........................................................................................................... 18

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
    985 F.2d 1190 (2d Cir. 1993) ............................................................................................... 6

*Wagenmann v. Adams*,
    829 F.2d 196 (1st Cir. 1987) .............................................................................................. 18

*Wis. Inv. Bd v. Bartlett*,
    No. 17727, 2002 Del. Ch. LEXIS 42 (Del. Ch. Apr. 9, 2002) ............................................. 20

*Yam Seng PTE Ltd v International Trade Corporation Ltd*
    [2013] EWHC 111 (QB) ..................................................................................................... 11

**Statutes**

15 U.S.C. § 78u-4(a)(6) ...................................................................................................... 27

**Other Authorities**

David Crow, *Medtronic: the Tax Inversion That Got Away*, Fin. Times*, Jan. 27, 2015 ............. 12

David Gelles, *After Tax Inversion Rules Change, AbbieVie and Shire Agree to Terminate Their Deal*, N.Y. Times, Oct. 20, 2014 ............................................................................................ 8

John D. McKinnon and Damian Paletta, *Obama Administration Issues New Rules to Combat Tax Inversions,* Wall Street Journal, Sept. 15, 2015 ....................................................................... 9

Karlee Weinmann, *Three Things to Know as Inversion Rules Muddle Medtronic Deal*, Law360, Sept. 29, 2014 ................................................................................................................... 12

Rakesh Sharma, *Medtronic Avoids U.S. Taxes While Saddling Shareholders With a Hefty Tax Bill*, The Street, Jan. 28, 2015 ................................................................................................ 12

Steven Davidoff Solomon, *A Merger in a Race With Congress*, N.Y. Times*, June 16, 2014 ..... 12

**Rules**

Fed R. Civ. P. 23 ........................................................................................................................ 34

Lead Plaintiff Rosenfeld Family Foundation ("Lead Plaintiff")[1] submits this Reply in further support of its Motion for Final Approval of Settlement, Class Certification, and Award of Attorneys' Fees and Expenses ("Motion"), and in response to the objections of Winona A. Crist ("Crist" and the "Crist Objection"), Bruce McLanahan (the "McLanahan Objection") and Graham Newhouse (the "Newhouse Objection").

## PRELIMINARY STATEMENT

Following the entry of the May 19, 2015 order preliminarily approving the proposed Settlement ("Preliminary Approval Order"), over 460,000 notices were disseminated to members of the conditionally certified Class in accordance with the manner set forth in the Stipulation and Preliminary Approval Order.[2]   In response, the Parties have received only three objections.  All three should be overruled.

Crist, who is closely aligned with Fordham University law professor Sean J. Griffith[3] and the "objector clinic," has launched an objection for the sole purpose of objecting to M&A litigation settlements.  The Crist Objection entirely misunderstands and mischaracterizes the focus of the litigation and Plaintiffs' litigation efforts, the nature of the claims asserted in the Action, and the value of the benefits achieved.  Moreover, Crist misreads the plain language, intent and application of the Private Securities Litigation Reform Act (Private Securities Litigation Reform Act of 1995, 1995 Enacted H.R. 1058, 104 Enacted H.R. 1058, 109 Stat. 737) (the "PSLRA").  The PSLRA ***does not*** supplant the long standing common benefit doctrine

---

[1] All capitalized terms that are not otherwise defined shall have the same definitions as set forth in the Stipulation of Settlement and Release, dated May 15, 2015 ("Stipulation")

[2] *See* Affidavit of Jose C. Fraga Regarding the Mailing of Notice of Pendency of Class Action, Proposed Settlement of Class Action and Settlement Hearing ("Fraga Affidavit"), ¶ 6.  Dkt No. 51-1

[3] Professor Griffith has recently stated that "[o]ne of my hopes here at Fordham is to launch a clinic for objectors, for shareholder objectors. And what I have done in connection with this clinic is I started buying shares on [merger] announcement day." A video recording of the March 26, 2015 panel discussion at which these remarks were presented is available at http://www.totalwebcasting.com/view/?func=VOFF&id=fordhamlaw&date=2015-03-26&seq=1. The quoted comments appear 48 minutes and 20 seconds in.

under federal law and ***does not*** contain a strict prohibition against an award of attorneys' fees when benefits achieved are non-monetary.  Rather, with respect to fees, the PSLRA operates to prevent an unreasonable portion of monetary recoveries being allocated to attorneys' fees when monetary recoveries are achieved.   Finally, Crist ignores the fiduciary duties that directors of Irish companies owe to shareholders and misstates the application and viability of Irish law in the litigation.

Stripped of its hyperbole and twisted interpretations of the facts and the law, it is evident that the Crist Objection has nothing to do with the interests of the Class and everything to do with promoting the interests of her serial objector-attorney husband and his close ally, Professor Griffith.

The McLanahan and Newhouse Objections similarly present no basis for denying approval of the Settlement or Plaintiffs' request for an award of attorneys' fees.  Mr. McLanahan objects to Court-approved and time-tested due process aspects of the Notice and objection procedure and the quality of the Supplemental Disclosures, without providing any grounds. Moreover, McLanahan has yet to credibly demonstrate that he is a former Covidien shareholder with standing to pursue an objection.   Mr. Newhouse has raised an administrative concern discussed previously in Plaintiffs' Motion, relief from which he will not be foreclosed by the Final Approval of the Settlement.[4]

As demonstrated herein and in Plaintiffs' Motion and supporting papers, the Settlement is fair, reasonable, and adequate and has provided valuable benefits to the Class and, thus, should be granted in full.  The three objections are baseless and should be rejected in their entirety.

---

[4] Additionally, the Parties are working cooperatively with Mr. Newhouse to address his administrative issue.

**ARGUMENT**

### I.    The Winona A. Crist Objection

On September 11, 2015, Crist, through her counsel, filed the Crist Objection, which asks the Court to reject the Settlement and Plaintiffs' counsel's request for attorneys' fees on the following meritless grounds: (1) the Supplemental Disclosures provide no benefit under U.S. or Irish law; (2) the proposed Settlement Release is overly broad; and (3) neither the PSLRA nor Irish law provide for an award of attorneys' fees in non-monetary settlements.

#### A.    The Settlement Should be Approved Because the Supplemental Disclosures Provided a Material Benefit to Covidien's Former Shareholders

##### 1)    The Tax Inversion Supplemental Disclosures and Goldman Supplemental Letter

Crist fundamentally misunderstands the timing and nature of the Tax Inversion Disclosures, as well as the impact of the material information in the Tax Inversion Disclosures as it pertains to the Transaction. One of the reasons that Medtronic undertook the Transaction was to take advantage of the benefits of tax inversion via reincorporation into Covidien's Irish domicile. Indeed, the Transaction was contingent on, among other things, certain changes to existing tax law not occurring that would affect the ability to take advantage of the Tax Inversion benefits.[5] Plaintiffs' initial complaint alleged as much, and further alleged that Covidien's shareholders were not being provided with their fair share of these benefits, which were only possible due to Covidien's domicile.[6]

At the same time, Plaintiffs were aware that the U.S. government was close to issuing new tax regulations that could further impact the value of the deal to Covidien's shareholders. That occurred on September 22, 2014, which created significant uncertainty with respect to

---

[5] Covidien Form DEF 14A dated November 21, 2014 at 31, 310. Leviton Declaration, Ex. ("Ex.") A.
[6] *See* Taxman Complaint at ¶¶5, 47 (filed July 10, 2014).

pending inversion deals, including the Transaction.  For instance, the proposed new rules broke up a pending merger between AbbVie Inc. and Shire PLC, and were a significant deterrent to Pfizer renewing its efforts to purchase AstraZeneca.[7]  Medtronic announced that it was evaluating the proposed changes in light of the announced regulations.[8]

These events caused Plaintiffs to refocus their efforts on the impact the announced proposed regulations would have on the value of the Transaction to Covidien shareholders. Plaintiffs reviewed the publicly available information with the assistance of a retained financial consultant and became concerned about two specific issues related to the new rule's prohibition on tax-free repatriation of offshore cash: (1) whether this prohibition affected the Covidien Board's assessment of the value of the Transaction consideration, *i.e.*, did the Covidien Board assume use of the off-shore cash when deciding to enter into the Transaction; and (2) what the impact would be on Medtronic's plan to finance the cash portion of the Transaction with off-shore cash, and the related impact on Transaction fairness.  Because neither of these concerns was answerable by information in the public domain, counsel for Plaintiffs engaged with counsel for Defendants in an effort to access confidential information that could provide clarity.

On October 8, 2014, Covidien provided Plaintiffs' counsel with certain discovery, including Goldman's presentations to the Board and other critical information pertaining to the Transaction.  After analyzing this discovery with their financial expert, Plaintiffs' counsel engaged in extensive discussions with counsel for Defendants to achieve two principal goals: (1) to understand the impact of the treasury regulations on the fairness of the Transaction to Covidien shareholders and to make sure such impact was adequately disclosed to shareholders;

---

[7] David Gelles, *After Tax Inversion Rules Change, AbbieVie and Shire Agree to Terminate Their Deal*, N.Y. Times, Oct. 20, 2014. Ex. B.
[8] John D. McKinnon and Damian Paletta, *Obama Administration Issues New Rules to Combat Tax Inversions,* Wall Street Journal, Sept. 15, 2015. Ex. C.

and (2) to determine the impact of necessary alternate financial structures to finance the cash portion of the consideration and secure a confirmation from Goldman of the Transaction's fairness assessing such impact with related disclosure.

Partially as a result of the litigation and the extensive discussions and negotiations between counsel for Plaintiffs and Defendants during the course of the litigation, on October 20, 2014, Goldman confirmed by letter to the Board (the "October 20 Supplemental Letter"), after analyzing the effect of the new tax structure, its conclusions in Goldman's original Fairness Opinion, dated June 24, 2014. This was first disclosed to Covidien shareholders on October 21, 2014. The Parties thereafter continued to negotiate the scope of disclosure related to the material information described above, resulting in the Supplemental Disclosures filed with the SEC and disseminated to shareholders on or about December 23, 2014.

As discussed in Plaintiffs' opening brief in support of final approval, the Tax Inversion Disclosures and related Goldman confirmation of its original Fairness Opinion provided material benefits to Covidien shareholders. The provisions to the proposed new tax rules created significant uncertainty in the market, and prior to Plaintiffs working to secure disclosure of additional material information, Covidien shareholders had no way to assess the impact that the proposed the new rules would have on the Transaction. As a result of Plaintiffs' efforts, that confusion was removed, enabling Covidien shareholders to make a fully informed decision whether to vote for or against the Transaction.

Crist misapprehends this timeline and attempts to belittle Plaintiffs' extensive efforts in securing these benefits. Crist suggests, essentially, that Plaintiffs were not responsible for the Tax Inversion Disclosures because the disclosure document was basically a reiteration of previous disclosures Covidien had made concerning the impact of the new tax rule. (Crist Obj.

at 14-16). But an actual understanding of the events that unfolded demonstrates that Plaintiffs had a causative role in providing this information to Covidien shareholders at every step of the way. And, the fact that some of the Tax Inversion Disclosures may have trickled into the market place at fits and starts as the impact of the IRS rule was assessed does not diminish the value of a single disclosure document that provides all the information to shareholders in a highly digestible format in connection with their voting decision. The law is clear on this point – shareholders should not be required to hunt and peck through SEC filings to get the information they need to vote, nor can a proxy solicitation incorporate by reference unrelated filings to insinuate information into the voting decision. *See, e.g., O'Malley v. Boris*, 742 A.2d 845, 851 (Del. 1999) ("Investors should not be required to correctly 'read between the lines' to learn all of the material facts relating to the transaction at issue."); *In re TWA, Inc. S'holders Litig*., No. 9844, 1988 Del. Ch. LEXIS 139 , at *29 (Del. Ch. Oct. 21, 1988) ("Nor can I agree that if a fact is material . . . a failure to disclose it is necessarily cured by reason that it could be uncovered by an energetic shareholder by reading an SEC filing."); *United Paperworkers Int'l Union v. Int'l Paper Co.,* 985 F.2d 1190, 1199-1200 (2d Cir. 1993) (holding that "the district court properly rejected Paper Co.'s contention that public press reports and its 10-K Report should be viewed as part of the total mix of information reasonably available to shareholders"); *see also Smallwood v. Pearl Brewing Co*., 489 F.2d 579, 605 (5th Cir. 1974) ("We cannot accept the premise that prior disclosure in one communication will automatically excuse omissions in another."); *Sealy Mattress Co. v. Sealy, Inc*., 532 A.2d 1324, 1340 (Del. Ch. 1987) ("[t]he duty of candor must be discharged by the fiduciary directly to the beneficiary stockholder in the transaction itself").

Crist also fails to understand the material value of the Tax Inversion Disclosures. The fact that the Covidien Board ascribed value to the tax-free repatriation of Covidien off-share cash in order to finance the transaction but that such value did not impact fairness was an overarching concern of the marketplace that Plaintiffs were able to address. The press on this point was ubiquitous – nearly every reference to the Transaction both before and after the new tax rule was announced focused on the value of Medtronic's offshore cash and what that meant for the deal.[9] Press routinely cited Tax Inversion Benefits as the real basis for the Transaction before the proposed new tax rules came down; and press routinely speculated after the tax rule was announced that its impact could scuttle the Transaction.[10] That the tax regulations arguably impacted the value of the Transaction to Covidien's shareholders was a benefit of the Goldman October 20 Supplemental Letter that shareholders could use to decide whether to support the Transaction. With that information, shareholders could make the decision whether it was still a deal worth supporting or whether to vote against the transaction in hopes of a better deal coming along. This material information squelched significant uncertainty and provided the basis for a fully informed shareholder vote.

Similarly, the value of the Goldman October 20 Supplemental Letter cannot be diminished. When the Covidien Board voted to approve the Transaction, it did so based on a cash financing scheme that was no longer viable. It was critical that fairness be reassessed once this fundamental deal point had to be reconfigured, especially because it would cause Covidien shareholders to accept a more highly leveraged transaction. The Covidien Board could not have

---

[9] Karlee Weinmann, *Three Things to Know as Inversion Rules Muddle Medtronic Deal*, Law360, Sept. 29, 2014; Rakesh Sharma, *Medtronic Avoids U.S. Taxes While Saddling Shareholders With a Hefty Tax Bill*, The Street, Jan. 28, 2015. Ex. E.

[10] Steven Davidoff Solomon, *A Merger in a Race With Congress*, N.Y. Times, June 16, 2014 ("this deal is built on the inversion tax loophole.") Ex. F.; David Crow, *Medtronic: the Tax Inversion That Got Away*, Fin. Times, Jan. 27, 2015 ("Omar Ishrak, the [] chairman and chief executive of Medtronic, says that buying Covidien was as much about corporate strategy as tax…"). Ex. D.

renewed its recommendation to shareholders without this assessment, and shareholders should not have been asked to vote in the absence of a fully informed Board recommendation.  Plaintiffs were a substantial cause in part of this benefit, the absence of which would have potentially created significant impediments to Transaction closure.

In short, the Tax Inversion Disclosures provided material benefits to shareholders, more than adequate to support the release of admittedly weak claims (as discussed *infra*).  Thus, the Crist Objection should be overruled as it pertains to this benefit.

### 2)  The Goldman Supplemental Disclosures

Crist similarly misunderstands the nature and importance of Goldman Sachs' *Illustrative Pro Forma Accretion / Dilution Analysis* and *Analyst Price Targets Analysis* (the "Goldman Disclosures"), as well as the impact of the material information in the Goldman Disclosures as it pertains to the Transaction.

As part of the Supplemental Disclosures, shareholders were provided a previously undisclosed *Illustrative Pro Forma Accretion / Dilution Analysis* performed by Goldman Sachs and provided to the Board in connection with the June 14, 2014 Fairness Presentation. Specifically, information was provided that, according to Goldman Sachs's analysis, the Merger was expected to be accretive to Medtronic's cash earnings per share basis for fiscal years 2016 through 2018 in the range of 5.4% to 13.5%.

This was valuable because it demonstrated the Merger was expected to be accretive to Medtronic's shareholders soon after the expected closing of the Merger.  While this indicated Medtronic could have theoretically paid more for Covidien and still have enjoyed reasonable earnings accretion, it simultaneously demonstrated that the financial benefits from the Merger were large enough to withstand some impairment by the loss of the tax benefits.  This was

particularly important as the Merger consideration was comprised of over 60% stock in New Medtronic.  As such, the value of this stock, and therefore of the Merger consideration, was largely predicated on the continued success and valuation of New Medtronic's shares.

As part of the Supplemental Disclosures, a summary of Goldman Sachs' *Analyst Price Targets Analysis* which was also provided to the Board in connection with the June 14, 2104 Fairness Presentation was disclosed for the first time.  Goldman Sachs had reviewed price targets from equity analysts covering Covidien and determined that "the price targets for Covidien ranged from $71.00 to $82.00 per share with a median price of $80.00."  This Supplemental Disclosure was important to demonstrating the strategic value of the Merger between Covidien and Medtronic.

The Merger consideration was valued at approximately $93.00 per share, which was noticeably higher than the analyst price targets.  While the tax benefits of the Merger were not the driving force, there was some value to those tax attributes.  As such, knowing the premium being offered compared to analyst price targets for Covidien on a standalone basis was valuable in re-assessing the Merger once the tax benefits from the inversion were eliminated.

Moreover, it is important that shareholders understand the scope of information presented to and considered by the Board concerning fairness of Merger consideration, regardless of whether technically a "valuation analysis."  In light of this disclosure, shareholders know for the first time that, despite the existence of analyst estimates that far exceeded the $93.00 per share Merger consideration, Goldman only presented the Board with analyst estimates of up to $82.00 per share.  The new disclosure allowed Covidien's shareholders to evaluate whether the Board was fully informed by its financial advisor, Goldman Sachs, about analysts' views of the Company's true value.

**B.    The Supplemental Disclosures Provided a Material Benefit to Covidien's Shareholders and Serve as Sufficient Consideration for the Settlement Under Irish Law**

The Crist Objection, relying exclusively on the Declaration of G. Brian Hutchinson ("Hutchinson Decl.") and no legal authority of its own, erroneously claims that the Supplemental Disclosures provide no benefit under Irish law and, thus, do not justify the Release.  (Obj. 11-12).  The Hutchinson Declaration, however, like the Crist Objection, contains virtually no legal authority or support for any of its conclusions and, instead, relies on Hutchinson's own speculation and conjecture for conclusions that he concedes have no support under Irish law. Hutchinson Decl., ¶ 7 ("litigation of the kind which resulted in the settlement now under review is relatively unknown in Irish Law").    Thus, the Hutchinson Declaration should be stricken. *Pena Crespo v. Puerto Rico*, 408 F.3d 10, 13-14 (1st Cir. 2005) (affirming district court's decision to exclude expert report where the report "did not . . . explain the basis and reasons for Dr. Alonso's opinions [or] describe any exhibits Dr. Alonso planned on using"); *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 588 (1993) (expert analysis must be based on "more than subjective belief or unsupported speculation").  Moreover, as discussed below, Irish law recognizes a board of directors' fiduciary duties and the requirement for shareholders to make a fully informed decision on matters concerning their interests and, thus, the Crist Objection is wholly without merit.

It is well-accepted under Irish law that directors of a company owe their shareholders fiduciary obligations where they expressly undertake to act in a certain way in relation to shareholders in the context of dealings, which closely concern shareholder interests and are enforceable by the shareholders personally.  *Allen v. Hyatt* (1914) 30 T.L.R. 444 (P.C.), Fleming Dec., Ex. G; *Crindle Investments, Roche and Roche v. Wymes*, Woods, Bula Holdings and Bula

Ltd. 81, Keane J. (same), Ex. H; *Coleman v. Myers* [1977] 2 N.Z.L.R. 298 (C.A.) (holding directors owe fiduciary duties where there is "[a] dependence upon information and advice, the existence of a relationship of confidence, the significance of some particular transaction for the parties and the extent of any positive action taken by or on behalf of the directors to promote it"), Ex. I.

Those fiduciary duties include the duty of full disclosure of all relevant information necessary for shareholders to make an informed decision. *Coleman,* 2 N.Z.L.R. 298 (C.A.) (holding in the context of the proposed take-over that "***the directors owed a fiduciary duty to the shareholders to fully disclose all information relevant to an informed decision on the question of whether to accept the offer***"), Woodhouse J. (emphasis added), Ex. I. Indeed, just last month, the Irish High Court in in *Flynn v Breccia* [2015] IEHC 547 (August 13, 2015), found an implied duty of good faith and fair dealing existed in every shareholder agreement. Ex. AA. Relying upon the approach adopted by Justice Leggatt in the English decision *Yam Seng PTE Ltd v International Trade Corporation Ltd* [2013] EWHC 111 (QB) (Ex. J), the court found a ***duty of full disclosure was included within the duty of good faith and fair dealing***. Crist's own expert concedes that, similar to U.S. law, Irish law requires that shareholders "have sufficient time and information to make an informed decision" on the proposed merger. Hutchinson Decl., ¶ 8; *see also* ¶ ¶ 10-11 (same).

Accordingly, it is beyond dispute that the Covidien Board owed the Company's former shareholders fiduciary duties in connection with the transaction, including the duty of full disclosure. As discussed above, the Supplemental Disclosures provided additional, material information to Covidien's shareholders that was necessary for them to cast a fully informed vote on the Transaction. Thus, contrary to Crist's unsupported objection that Plaintiff's disclosure

claims have "no basis in Irish law" (Obj. at 11), which contradicts her own expert, the Supplemental Disclosures provided a substantial benefit to Covidien shareholders.[11]

Next, Crist makes the gigantic, unsupported leap that the Settlement provides no benefit simply because no Covidien shareholder elected to participate in the process under Irish law in which "Irish authorities proactively review the terms of takeovers" (Obj. at 11-12).[12] Again, Crist cites no legal or other authority for her meritless argument. Moreover, the majority of Covidien shareholders are U.S. shareholders who are much less likely to avail themselves of the Irish courts when they have courts of competent jurisdiction in the U.S. Certain of those shareholders, including Plaintiffs, opted to participate in the process of ensuring the transaction was fair to Covidien shareholders, which resulted in the proposed Settlement. The fact that the regulatory bodies such as the Irish authorities or the U.S. SEC or FTC also reviewed the transaction without issue (to Plaintiffs' counsels' knowledge) does not mean that the Covidien Board complied with its fiduciary duties, nor does it usurp shareholders from privately vindicating their rights, as Crist would have it (Obj. at 12).

Finally, Crist argues in one breath that Irish law does not provide for damages in the context of takeovers such as this (Obj. at 1), yet in the next breath, complains that the Release in the Stipulation unfairly requires Covidien shareholders to give up those claims under Irish law (Obj. at 11-12). Crist cannot have it both ways. As discussed above, the Supplemental Disclosures provide a valuable benefit under Irish law. Moreover, a release of damages claims,

---

[11] Crist criticizes Plaintiffs for not citing a single case in which an Irish court has required supplemental disclosures (Obj. at 11). Yet neither Crist, nor her expert, can cite a single case in which an Irish court considering a settlement such as this has held that supplemental disclosures do not provide an important benefit to shareholders. In fact, Crist's own expert concedes that "litigation of this kind which resulted in the settlement now under review is relatively unknown in Irish Law". Hutchinson Decl., ¶ 7. Moreover, Crist is wrong. As her own expert concedes, Irish law recognizes full disclosure as an important benefit to shareholders.

[12] Regardless, the Irish High Court would be an inadequate forum in which to litigate Plaintiffs' claims because, as discussed below, High Court review does not offer Plaintiff an opportunity to seek damages to compensate it for the harm stemming from selling the Company for an inadequate price.

which Crist and her expert (Hutchinson Decl., ¶ 19) concede do not exist under Irish law anyway, and which Plaintiffs' own expert has opined have little value, in exchange for the Supplemental Disclosures constitutes more than ample consideration for the Release and has been found by numerous courts to be fair.  *See, e.g.*, Motion at 20-21.[13]

## C.     The Release Satisfies Due Process and is Sufficiently Narrow to Justify the Claims Being Released

The Crist Objection makes the unsupported conclusion that the Release is unfair, but provides only half the analysis.  As Crist concedes, courts consider "what benefit was conferred by the supplemental disclosures as compared to the benefit conferred by the release, determining whether, as a fiduciary to the class, the court finds the trade reasonable.[14]  (Crist Obj. at 8).  Yet, the Crist Objection offers *no* analysis of the claims being released or the "give."

---

[13] While not specifically referenced in the Crist Objection, Hutchinson appears to argue, again without any legal support or analysis, that Plaintiffs must bring their claims for breach of fiduciary duty under Irish law, derivatively. Hutchinson Decl., ¶¶ 21-22.  However, where, as here, Plaintiff alleges a fraud on the minority whereby directors secure a benefit for themselves at the expense of the company and/or claims are asserted under Section 205 of the Companies Act of 1963, Plaintiffs may assert their claims directly. http://www.austlii.edu.au/au/journals/SydLRev/1983/10.pdf.   The modern view (which the Hutchinson Decl. ignores, ¶ 18) is that a "fraud" can occur wherever directors, even if acting in good faith, "are guilty of a breach of duty to the company and as a result of that breach obtain some benefit."  *Id.*; *Daniels v. Daniels* (1978 Ch 406), Templeman J. (holding "that a minority shareholder who has no other remedy may sue where the directors use their power intentionally or unintentionally, fraudulently or negligently in a manner which benefits themselves at the expense of the company.") (citing Corporate Governance and Directors' Liabilities: Legal, Economic, and Sociological Analyses on Corporate Social Responsibility), Klaus J. Hopt, Gunther Teubner Walter de Gruyter, Jan 1, 1985), Ex. K; *Remedies of Minority S'holders, Scottish Co-Operative Wholesale Society Ltd. v. Meyer and Anor*, Sydney L. Rev., at 567-571 (analyzing *Scottish Wholesale Co-Operative Society v Meyer* [1959] AC234 (where defendants used their majority holdings to squeeze out the minority by underhanded means, the majority shareholder was held to have exercised the powers in a manner which was "burdensome, harsh and wrongful"), Ex. L).  Following *Scottish Wholesale*, Judge Keane in *Greencore Trading Co Ltd* [1980] ILRM 94 (Ex. M) and Judge Kenny in *Re Westwinds Holding Co. ltd* High Court, unreported (21 May 1974) held that selling Company assets for below market value was a sufficient act of oppression.  Ex. N.  Under Section 205, shareholders may commence legal proceedings against the company where the affairs of that company are being conducted or the powers of the directors of that company are being exercised: (1) in a manner oppressive to any shareholders of that company; or (2) in disregard of any shareholders' interest as a member of that company.   Conduct is considered oppressive where, as here, directors act in a deliberate scheme to deprive the minority of their rights or cause them loss and damage.  *See Re Clubman Shirts Ltd* [1988] I.L.R.M. 323 (H.C.) per O'Hanlon J.  Ex. Q.

[14] Even a weak settlement - which is not what Lead Counsel obtained here - can be reasonable if the released claims are also weak.  *In re Peregrine Semiconductor Corp. Stockholder Litigation*, No. 10119-CB (TRANSCRIPT) (attached as Leviton Decl., Ex. O) (Del. Ch. Apr. 13, 2015) at 9:8-11 ("I am making the decision to approve the settlement because ultimately the trade off here is trading essentially weak claims for supplemental disclosures that I think have some value.").  Indeed, Delaware courts have emphasized that "there is no just reason to disapprove

The Crist Objection does not provide *any* analysis of the claims other than disclosure claims that are being released (the "Other Claims") - let alone suggest that approval of the Settlement is wrongfully extinguishing a particularly valuable Other Claim. *Compare with In re Activision Blizzard, Inc. S'holder Litig.,* 2015 Del. Ch. LEXIS 140, at * 79 (Del. Ch. May 20, 2015) (rejecting objection to settlement that released, *inter alia*, federal securities claims where "[I]t is theoretically possible that the Seller Class might possess federal securities law claims. . . . [But the objector] has not provided any reason to believe that any of the Class' personal claims, including hypothetical federal securities law claims, have any value.").[15]

Although Crist has chosen not to analyze the Other Claims, Lead Plaintiff, in the exercise of its fiduciary duties, evaluated those claims before agreeing to the Settlement.

As set forth in the Stipulation, the released claims are all claims that Class members had or might have in their capacity as shareholders, arising out of the negotiation of, entry into, and effectuation of the Transaction, other than (i) the claims currently asserted in *In re Medtronic, Inc. Stockholder Litigation*, 27-CV-14-11452, in the District Court, Fourth Judicial District of Hennepin County, Minnesota; (ii) the claims asserted in *In re Medtronic, Inc. Derivative Litigation*, 14-cv-3540, in the United States District Court for the District of Minnesota, prior to the dismissal without prejudice of that action; or (iii) any claims to enforce the Settlement. *See* Stipulation, ¶ 9.

---

settlements in cases where the class is being treated fairly" even where "it is arguable that the class possesses no viable claims at all." *In re Cox Communs., Inc. S'holders Litig.*, 879 A.2d 604, 634-635 (Del. Ch. 2005).

[15] It is also worth noting that no other Covidien shareholder or firm sought leadership following publication of the initial PSLRA notice or attempted to object to the settlement in order to preserve certain claims they believed were valuable. *Compare with In re Rural/Metro Corp. S'holders Litig.*, C.A. No. 6350-VCL (TRANSCRIPT) (Del. Ch. Jan. 17, 2012) (attached as Leviton Decl., Ex. P) (upholding objection, denying settlement, appointing objector firms to represent the class). Similarly, over 460,000 notices were sent out to Covidien shareholders. Not a single shareholder has identified a valuable claim.

As in any acquisition, Covidien shareholders, in their capacity as shareholders, had potential claims relating to the Transaction arising under state and federal law.

In Lead Counsel's informed judgment - after discovery and consultation with a valuation expert – Plaintiffs' damages claim was unlikely to succeed under Irish law and there appeared to be no valuable federal damages claims. The most significant claims were the disclosure claims, which were resolved via the Supplemental Disclosures.

Plaintiffs believed their damages claim against Defendants was meritorious when filed. Covidien's failure to conduct even a preliminary market check and its ascription of value to Covidien's Irish domicile raised red flags regarding the adequacy of the consideration and whether Covidien's shareholders were being provided with their fair share of the tax benefits the surviving company would receive due to Covidien's domicile. Ultimately, however, Plaintiffs' expert opined that the Transaction price fell within the range of reasonableness. Crist does not (and likely could not) dispute this conclusion.

Similarly, Lead Counsel believes their disclosure claims were meritorious when filed, but have been resolved by the Supplemental Disclosures. (A substantial discussion of those claims is set out above). Again, Lead Counsel are unaware of - and Crist does not (and again, likely could not) identify - any valuable disclosure claims (other than the Supplemental Disclosures) that are being extinguished by the Settlement.

Lead Counsel - who have significant securities litigation did not believe that any valuable federal securities claim were being extinguished by the Settlement. To state a 10b-5 claim, for example, a plaintiff would have to show loss causation—i.e., that Covidien's "share price fell significantly after the truth [of some, as yet unknown, misrepresentation or omission] became known." *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). At the time of the

Settlement, however, Covidien had just weeks left as a publicly traded company.  Unless the as-yet-unknown misrepresentation surfaced in those few weeks, it could not cause Covidien's stock to drop and, thus, could not harm Covidien shareholders.

It would be similarly challenging for Lead Counsel to assert damages claims under Irish law.  As Crist concedes, Plaintiffs faced severe challenges pressing damages claims under Irish law.  Hutchinson Decl, ¶ 19.  As Crist further concedes, litigation of this kind which resulted in the settlement under review is relatively unknown in Irish Law."   Hutchinson Decl., ¶ 7.  Therefore, even if Plaintiffs had pursued a preliminary injunction on their disclosure claims, it is likely the Court would find that Plaintiffs' disclosure claims represent a novel issue under Irish law and decline to exercise supplemental jurisdiction.  *See Louisiana Municipal Police Employees Retirement Sys. v. Cooper Indus. plc, et al.*, 2012 U.S. Dist. LEXIS 148542, at * 40-42 (N.D. Oh. Oct. 16, 2012) (declining to exercise supplemental jurisdiction over plaintiffs' Irish law claim under Section 205 of the Irish Companies Act as "if the Court were to address plaintiffs' Irish law claim, it would be doing so without any meaningful guidance from Irish courts").

Most importantly, the Crist Objection fails to mention that the Release pertains to claims relating to the Transaction, is not intergalactic and, in fact, includes a carve-out for ongoing litigation.  Specifically, the (i) claims currently asserted in *In re Medtronic, Inc. Stockholder Litigation*, 27-CV-14-11452, in the District Court, Fourth Judicial District of Hennepin County, Minnesota; and (ii) the claims asserted in *In re Medtronic, Inc. Derivative Litigation*, 14-cv-3540, in the United States District Court for the District of Minnesota, prior to the dismissal without prejudice of that action, have not been, nor will they be released as a result of the Settlement.

The paucity of Crist's analysis of the "give" (*i.e.*, the value of the released claims) is even more striking when compared to her six-page discussion of the "get" (*i.e.*, the value of the Supplemental Disclosures). *See* Obj. at 12-17. At root, however, because the "give"—*i.e.*, the released claims—are of limited value, the question that the Court must answer to approve the Settlement is a simple one: are the Supplemental Disclosures meaningful? Under well-settled law, the answer is yes.

### D.    The PSLRA and Irish Law Provide for an Award of Attorneys' Fees

Without citation to relevant authority, Crist makes the sweeping assertion that the PSLRA supersedes the well-established substantial benefit doctrine supporting an award of attorneys' fees where, as here, plaintiffs' efforts resulted in supplemental disclosures providing material information to shareholders and other non-monetary benefits well in advance of a vote on a corporate merger.  That is, however, not the law.   Moreover, even if, the PSLRA has superseded the substantial benefit doctrine (and it has not), Crist finds a strict prohibition against the award of attorneys' fees in cases involving non-monetary benefits that does not exist.  The language and intent of the relevant fee section of the PSLRA is obviously directed at preventing attorneys from taking an unreasonable portion of a monetary or common fund recovery in the event that damages and prejudgment interest are paid to the class, not to preclude awards when the benefit is non-monetary and an award of attorneys' fees does not reduce benefits inuring to the Class.

As a threshold matter, Crist omits that the Parties agreed on an amount of attorneys' fees, and reached that agreement only after extended negotiations that Defendants expressly state were the sole cause of the dissemination of the Supplemental Disclosures to the Class.  *See* Stipulation, ¶¶ 1, 4.  Authorities cited in the Memorandum of Law in Support of Lead Plaintiff's

Unopposed Motion for Final Approval of Settlement, Class Certification, and Award of Attorneys' Fees and Expenses ("MOL"), make clear that courts can, and do, give great weight to fee agreements negotiated by the parties.  *See* MOL at 17-18, citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (holding that an unopposed fee is ideal because "[a] request for attorneys' fees should not result in a second major litigation.  Ideally, of course, litigants will settle the amount of a fee."); *Wagenmann v. Adams*, 829 F.2d 196, 226 (1st Cir. 1987) ("[i]f at all possible, we are determined – in this and other kindred cases – to sidestep the dismaying prospect of the counsel fee tail continuing to wag the merits' dog."); *see also Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ("[t]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties").

The Court's role in awarding attorneys' fees where the parties have reached an agreement on fees is different from a common fund case where the awarded fee is subtracted from a monetary recovery for the class.  This context is also different from a statutory fee-shifting case in which defendants did not agree to pay plaintiffs' counsel's fee and reserved the right to challenge plaintiffs' request.  Here, highly experienced and able counsel for Defendants had every incentive to negotiate a fee award that was fair and in the best interests of their clients, and negotiated to pay a fee up to $540,000 subject to Court approval.

It is black letter law that the substantial benefit doctrine applies whether that benefit is monetary or injunctive.  *See, e.g., TSC Indus.v. Northway, Inc.*, 426 U.S. 438 (1976) (recognizing the importance of providing shareholders with all material information in order to promote the free exercise of the voting rights of shareholders); *Mills v. Electric Auto-Lite Co.*,

396 U.S. 375, 396 (1970).   Like Plaintiffs here, the plaintiffs in *Mills* alleged that a proxy statement issued to solicit shareholder votes in favor of a merger was misleading in violation of § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").   *Id.*, at 377.   The Supreme Court expressly stated that remedies for violations of § 14(a) were equitable, and that monetary damages were recoverable "only if the merger resulted in a reduction of the earnings or earnings potential of [stockholders'] holdings."   *Id.*, at 386.   However, purely equitable relief is no bar to attorneys' fees; the Supreme Court held that the "substantial benefit" of the suit justified "an award of counsel fees, regardless of whether the benefit is purely pecuniary in nature," and further found that "[t]he fact that this suit has not yet produced, and may never produce, a monetary recovery from which the fees could be paid does not preclude an award based on this rationale."   *Id.*, at 392-394.

Following *Mills*, courts awarded attorneys' fees for providing shareholders with additional information.   "Attorneys' fees are awardable even though the benefit conferred is nonpecuniary in nature."   *Merola v. Atlantic Richfield Co.*, 515 F.2d 165, 169-170 (3d Cir. 1975) (citing *Mills*, 396 U.S. at 375; *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1165 (Del. 1989) ("a heightened level of corporate disclosure, if attributable to the filing of a meritorious lawsuit, may justify an award of counsel fees.")); *Eisenberg v. Chicago Milwaukee Corp.*, C.A. No. 9374, 1988 Del. Ch. LEXIS 141, at *8 (Del. Ch. Oct. 25, 1988) ("[w]here a representative shareholder succeeds in correcting invalid disclosures in connection with a transaction between the corporation and its stockholders, our case law recognizes that for fee awarding purposes, the corporation and all of its shareholders are benefit[ted]."). [16]

---

[16] Authority relied upon by Crist makes clear that Delaware law is "instructive" on an application for attorneys' fees. *See In re Genzyme Corporation Shareholders Litig.* ("*Genzyme*"), Case No. 10-cv-11356, 2011 U.S. Dist. LEXIS 113351, at *16 (D. Mass. Sept. 13, 2011).

The PSLRA did nothing to change these bedrock principles.  Indeed, after the PSLRA was enacted in 1995, courts continued to award attorneys' fees where injunctive relief in the form of supplemental disclosures was obtained for shareholders.  *See, e.g., Davis v. Cent. Vt. Pub. Serv. Corp.*, 2012 U.S. Dist. LEXIS 139186 (D. Vt. Sept. 27, 2012) (awarding fee for disclosure-only settlement of Section 14 and Section 20 claims arising out of merger; looking to federal law as source of authority for fee award); *Krieger v. Atheros Communs., Inc.*, 2012 U.S. Dist. LEXIS 74214, at *24 (N.D. Cal. May 29, 2012) (stating in dicta that, [t]his Court has authority to award "litigation expenses and reasonable attorneys' fees" to a plaintiff whose Section 14(a) litigation confers a "substantial benefit" on behalf of a class of shareholders.") (citing *Mills*, 396 U.S. 375); *In re Schering-Plough/Merck Merger Litig.*, 2010 U.S. Dist. LEXIS 29121, at *48-49 (D.N.J. Mar. 25, 2010) (awarding attorney fees under *Mills*, 390 U.S. at 375 where "the supplemental disclosures facilitated communication  and informed shareholders of previously undisclosed material information permitting shareholders to exercise their voting rights accordingly."); *Wis. Inv. Bd v. Bartlett*, No. 17727, 2002 Del. Ch. LEXIS 42, at *17-*20 (Del. Ch. Apr. 9, 2002) (supplemental proxy disclosures provided a therapeutic benefit to shareholders by allowing for an informed vote), *aff'd*, 808 A.2d 1205 (Del. 2002) ); *In re AXA Fin., Inc. S'holders Litig.*, No. 18268, 2002 WL 1283674, at *7-*8, *26  (Del. Ch. May 22, 2002) (rejecting an objection to  the agreed attorneys' fee and finding that the fee was justified by the benefit created for shareholders of the acquired company); *Fountain v. Avondale Indus*., No. 95-1198, 1996 U.S. Dist. LEXIS 5045, at *3 (E.D. La. Apr. 18, 1996) (concluding that "[g]uaranteeing the shareholder's right to accurate information in proxy statements is exactly the sort of corporate therapeutics" that warrants the award of attorneys' fees), citing *Mills*, 396 U.S at 396. *See also* Ex. V., *In re QR Energy LP Unitholder Litig.*, No. 4:14-cv-02195, slip op. (S.D.

Tex. September 6, 2015); Ex. W, *Cooke v. Equal* Energy, No. 5:14-cv-00087-C, slip op. (W.D. Ok April 8, 2015); Ex. Z, *In re MetroCorp Bancshares, Inc. S'holders Litig.*, No. 4:13-cv-03198, slip op. (S.D. Tex. Oct. 23, 2014); Ex. X, *In re Crestwood Midstream Partners Unitholder Litig.*, No. 4:13-cv-01528, slip op. (S.D. Tex. May 16, 2014); Ex. Y, *Nichting v. DPL, Inc.*, No. 3:11-cv-141 (S.D. Ohio Feb. 24, 2012).[17]

The limitation on attorneys' fees provision provided in the PSLRA and relied upon by Crist, by its language, applies only to cases where the relief obtained for the class is monetary. By referring to the amount of "damages and prejudgment interest" as a yardstick for attorneys' fees, the statute does not apply to applications for attorneys' fees where the relief obtained for the class is injunctive, rather than a common fund to be distributed to the class.[18]  15 U.S.C. § 78u-4(a)(6).[19] Crist also argues that Massachusetts law would likewise preclude an award of attorneys' fees.  However, Crist does not contend that Massachusetts law applies here, and it does not.

---

[17] The cases cited by Objector are highly distinguishable.  In *Mostaed v. Crawford*, Civil Action No. 3:11-cv-00079-JAG, 2012 WL 3947978, at *3–*4, *10–*12 (E.D. Va. Sept. 10, 2012), plaintiffs sought a fee of $900,000 although the case was actively litigated in a parallel proceeding in the Delaware Court of Chancery, and the court found that the disclosures obtained in the settlement were either made due to requests by the Securities and Exchange Commission rather than plaintiffs, or were not material.   The court found that under the circumstances, the attorneys' fee request was unsupported by evidence of reasonableness and was "simply shocking."   *Id.* at *5.  *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007), is an antitrust case, not a securities case, and noted in dicta that relief in the form of discounts or coupons, which are not present here, would not support a fee request under the PSLRA.  In *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 804 (N.D. Ohio 2010), which is also not a securities case, the court rejected an objection as "policy-oriented as opposed to economic and self-serving," finding that it "did not increase the tangible or intangible benefits available to *this* Settlement Class." (emphasis in the original).  The Crist objection falls into the same category.

[18] The full text of the relevant section reads: "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff shall not exceed a reasonable percentage of the amount of any ***damages and prejudgment interest*** actually paid to the class."  15 U.S.C. § 78u-4(a)(6) (emphasis added).

[19]  The legislative history of the PSLRA clarifies that the limitation on fees was based on the perception that counsel in securities cases received a disproportionate share of the common fund created in a settlement, at the expense of the class.  The PSLRA remedy was to limit attorneys' fees to a "reasonable percentage" of the amount recovered for the class, but also to give courts flexibility in determining what is reasonable on a case-by-case basis.  *See* H.R. Conf. Rep. 104-369, at 36, 1995, reprinted at 1995 U.S.C.A.A.N. 679.  As Justice O'Connor later explained in a case relied upon by Crist, awards based on a percentage of the total fund available to the class "decouple class counsel's financial incentives from those of the class, increasing the risk that the actual distribution will be misallocated between attorneys' fees and the plaintiff's recovery."  *Lonardo*, 706 F. Supp. 2d at 800, quoting *Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223 (2000).  Where, as here, attorneys' fees are not paid out of a fund shared with the class, there is no potential inequity to address.

Authority cited by Crist holds that state law applies to an application for attorneys' fees in a diversity action.  *See In re Genzyme Corp. S'holder Litig.*, 2011 U.S. Dist. LEXIS 113351, at *16 n.14 (D. Mass. Sept. 13, 2011).  However, this action alleges violations of federal law, § 14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder,17 C.F.R. 240.14a-9, and § 20(a) of the Exchange Act, and does not allege any claims arising under Massachusetts law.[20] Accordingly, this action is based on federal question jurisdiction, not diversity.[21]

Even assuming Massachusetts state law did apply here – and it does not - Crist also misstates Massachusetts law as applied to attorneys' fees.  Contrary to Crist's suggestion that Massachusetts law requires the creation of a common fund to justify an award of attorneys' fees, the Supreme Judicial Court of Massachusetts expressly declined to reach that question, stating instead that "we need not decide whether intangible corporate benefits" may justify attorneys' fees.  *Martin v. F.S. Payne Co.*, 409 Mass. 753, 759 n.4 (1991).

Moreover, Crist's sole authorities on the requirements of Massachusetts law, Magistrate Judge Boal's report and recommendation, and Judge Tauro's subsequent order, in *Genzyme* are inapposite for several reasons.  In that case, plaintiffs' counsel sought a mootness fee of $975,000, or more than double their combined lodestar, after Genzyme entered into a merger agreement with another corporation.  *Genzyme*, 2011 U.S. Dist. LEXIS 113351, at *13-*14. Unlike this case, there was no agreement on attorneys' fees, and in fact defendants filed a motion to sanction plaintiffs and for their costs of defense pursuant to the PSLRA.  *Id.*, at *19-*20. Plaintiffs in *Genzyme* did nothing beyond file complaints and send a letter to defendants as

---

[20] *See* the *Rosenfeld Family Foundation* complaint at ¶13 and the *Lipovich* complaint at ¶17, both asserting federal question jurisdiction pursuant to 28 U.S.C. § 1331.  The *Taxman* complaint was filed on July 10, 2014, before New Medtronic filed the Preliminary Proxy Statement that is the basis of the federal claims on July 14, 2014.

[21]  Likewise, Crist's citation to *In re Volkswagen and Audi Warranty Extension Litig.*, 692 F.3d 4, 15 (1st Cir. 2012), is unavailing.   In that case, which settled state law claims only and was in federal court on diversity jurisdiction, the First Circuit held that state substantive law on attorneys' fees applied.  *Id.*  However, the court expressly distinguished diversity cases from federal question cases, where courts have inherent equitable powers to fashion a fee award.  *Id.*, at 16-17, citing *Mills*, 396 U.S. 375.

required by L.R. 16.1(c): they did not conduct any discovery, did not oppose defendants' motion to dismiss, did not seek or obtain further disclosures regarding the merger, did not conduct settlement negotiations, and, in short, did nothing to provide any benefit to Genzyme shareholders. *Id.*, at *3, *7, *18. There was no settlement reached in *Genzyme*, and plaintiffs moved for the voluntary dismissal of their action even before the Magistrate Judge rendered her report on plaintiffs' motion for attorneys' fees. *Id.*, at *13.[22] The court found that the mere chronology of events was insufficient to show that plaintiffs' efforts caused defendants' actions. *Id.*, at *18. Judge Tauro adopted the Magistrate Judge's report and recommendation, and denied plaintiffs' motion for attorneys' fees. *See Genzyme*, 2011 U.S. Dist. LEXIS 113335 (D. Mass. Sept. 29, 2011). The *Genzyme* case is a true outlier on the subject of attorneys' fees. Crist does not provide any authority following *Genzyme*, nor did Plaintiffs' research yield any published opinion citing *Genzyme* in ruling on an application for attorneys' fees. In contrast to *Genzyme*, Plaintiffs' extensive efforts to achieve significant benefits for the Class are well documented here, and the Parties' Stipulation at ¶¶ 1, 4 expressly states that Plaintiffs' efforts were the sole case for the dissemination of the Supplemental Disclosures.

As federal law provides a sufficient basis to determine an award of attorneys' fees, this Court need not decide whether attorneys' fees may be awarded under Irish law. As noted above, Crist's sole support for its argument regarding Irish law, the Hutchinson Declaration., is unencumbered by any legal authority, contradicts her argument, and should be stricken. To the extent that the Court is inclined to consider the Hutchinson Declaration, despite its fatal defects, it is noteworthy that the declaration focuses on the prohibition of damages pursuant to § 205 of

---

[22] The Magistrate Judge construed plaintiffs' motion for voluntary dismissal as a notice of voluntary dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i) and recommended that the case be dismissed. *See Genzyme*, 2011 U.S. Dist. LEXIS 113339, at *6 (Sept. 1, 2011). Judge Tauro adopted that report and dismissed the action. *See Genzyme*, 2011 U.S. Dist. LEXIS 113311, at *2-*3 (D. Mass. Sept. 29, 2011).

the Irish Companies Act. *Id*., at ¶ 19. As discussed in detail herein, Plaintiffs sought injunctive relief, not damages, for the Class, and the remedies outlined in the Hutchinson Declaration are injunctive in nature. *Id*. Moreover, the Hutchinson Declaration confirms Plaintiffs' citations above that the directors of Irish companies owe fiduciary duties to their shareholders. *Id*., at ¶ 21.

**E.   Crist, her Husband and Their Attorney, Joseph Christensen, are Serial Objectors that Come to Court with Ulterior Motives**

While Crist and her counsel spill much ink as to the Parties' engagement in "ritualized quasi-litigation" while following in the mold of American merger litigation, they leave out a key point about their own "objector playbook" – Crist's relationship to Jonathan M. Crist ("J. Crist"), a Pennsylvania-based attorney who has made a habit of objecting to disclosure-based settlements in courts across the country, and on at least one occasion, being represented by the same counsel engaged by Crist in the instant action (Szenberg & Okun PLLC). *Compare* Decl. of Winona A. Crist, ECF No. 62-1 (listing Crist's address as 2865 Church Road, Elizabethtown, PA 17022-9056) *with* Leviton Decl., Ex. R, Affidavit of Jonathan M. Crist filed in *Gordon v. Verizon Communications, Inc. et al*, Index No. 653084/2013, N.Y. Sup. Ct. (N.Y. Cty.) (listing J. Crist's address as 2865 Church Road, Elizabethtown, PA 17022-9056).

Tellingly, Crist uses the preliminary statement of her brief to attack "American-style 'merger objection' suits" generally, setting the table for a lawyer-driven crusade against disclosure-only settlements, as has been common among this particular cast of characters. Crist's husband, J. Crist, has objected to disclosure-based settlements in at least three other matters: *See* Leviton Decl., Ex. T, *Shaev v. Sidhu*, No. 0983, 2009 Phila Ct. Com. Pl. LEXIS 63, at *33-34 (Pa. Ct. C.P. Mar. 5, 2009) (awarding the requested amount of attorneys' fees over J. Crist's objection "that the attorneys' fees claimed by Plaintiffs' lawyers are excessive," a

decision later affirmed without opinion by the Pennsylvania Superior Court); Ex. S, *In re GenOn Energy, Inc. Shareholders Litig.*, C.A. No. 7721-VCN (TRANSCRIPT) (Del. Ct. Ch. June 24, 2013) (awarding an unopposed fee over J. Crist's objection in a disclosure-based settlement despite J. Crist's claim that the disclosures provided no meaningful benefit to the class of shareholders); Ex. R, *Gordon v. Verizon Communications, Inc. et al*, Index No. 653084/2013, N.Y. Sup. Ct. (N.Y. Cty.) (denying plaintiffs' motion for final approval of settlement, a decision currently on appeal to the Appellate Division of the New York Supreme Court). Likewise, Crist's counsel have begun to carve out a name for themselves as objectors to disclosure-based settlements, with Szenberg & Okun PLLC appearing in *Gordon v. Verizon* as J. Crist's counsel and Joseph Christensen P.A. currently leading a charge against similar settlements in Delaware in *In re Riverbed Technology, Inc. Stockholders Litig.*, Consol. C.A. 10484-VCG, along with Fordham University law professor Sean J. Griffith[23] (a former classmate of Crist's counsel, Jacob Okun), in a matter yet to be decided by that court. Notably, Mr. Griffith acted as an expert on behalf of J. Crist in his objection in *Verizon*, a coincidence that the Court should not overlook in its determination of whether or not Crist has come into court as a champion for Covidien shareholders or to pursue the ulterior motives of her husband and counsel. Further, while Crist and her counsel seize every opportunity in their brief to lambast Plaintiff's counsel for their inadequate litigation efforts to secure for themselves a fee, they make no mentions of their own intentions to seek the same for any perceived benefit they may provide to the class for breaking up the Proposed Settlement. Once again, Crist's counsel is simply following the "objector playbook," much like Mr. Christensen did in *Riverbed* when, at the end of his presentation before the Delaware Court of Chancery, and for the first time, he sought to reserve his rights to submit a

---

[23] Plaintiffs' further note that Objector Bruce McLanahan (whose objection is discussed *infra*) is also an Adjunct Professor Law at Fordham University.

fee application. *See* Ex. U, *In re Riverbed Tech., Inc. S'holder Litig.*, Consol. C.A. 10484-VCG (Del. Ct. Ch. July 27, 2015) (TRANSCRIPT) ("On the issue of incentives, just as an administrative matter, no matter what Your Honor does, I ask that you reserve jurisdiction to consider a fee application of myself as counsel to Mr. Griffith, only because there are cases in which objector's counsel has been precluded when that wasn't reserved.  I'm not making a fee application, and I will only do that if it seems appropriate.").

As such, Crist and her counsel are simply a new breed of professional objectors, masking their ulterior motives behind a campaign to change decades of jurisprudence regarding the benefit of supplemental disclosures, all while extracting notoriety and attorneys' fees for themselves. *See Barnes v. FleetBoston Fin. Corp.*, 2006 U.S. Dist. LEXIS 71072 (D. Mass. Aug. 22, 2006) ("[P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors."); *see also In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d 289, 295 (S.D.N.Y. 2010) ("I concur with the numerous courts that have recognized that professional objectors undermine the administration of justice by disrupting settlement in the hopes of extorting a greater share of the settlement for themselves and their clients."); *O'Keefe v. Mercedes–Benz USA, LLC*, 214 F.R.D. 266, 295 n.26 (E.D. Pa. 2003) ("Federal courts are increasingly weary of professional objectors").  The Court should disregard their efforts and give great weight to the Settlement recommendation of counsel for the Parties involved throughout the litigation. *See Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("the trial court is entitled to rely upon the judgment of experienced counsel for the parties"); *Rolland v. Cellucci*, 191 F.R.D. 3, 10 (D. Mass. 2000) ("When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given

significant weight."); *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 77 (D. Mass. 1999) ("The Court's fairness determination also reflects the weight it has placed on the judgment of the parties' respective counsel, who are experienced attorneys and have represented to the Court that they believe the settlement provides to the Class relief that is fair, reasonable and adequate.").[24]

## II.    The Bruce McLanahan Objection

Bruce McLanahan, a purported "small stockholder of Covidien PLC," submitted two letter objections to the proposed Settlement, one  on September 8, 2015 and the other on September 13, 2015 (collectively, the "McLanahan Objection").   The McLanahan Objection is defective and should be rejected by the Court for several reasons.   *First*, Mr. McLanahan did not submit proof of ownership, written or otherwise, evidencing that he was a Covidien stockholder at the relevant time as required by the Notice.    Thus, Plaintiff has no idea whether Mr. McLanahan is part of the Class or even has standing to assert an objection.   His objection should be disregarded on that basis alone.[25]   *Second*, Mr. McLanahan appears to object to the proposed Settlement on the following grounds – (1) the procedure for objecting to the Settlement is too

---

[24]   Despite having likely known about the proposed Settlement since December 23, 2014 when Covidien filed a Form 8-K with the SEC disclosing the proposed Settlement and the Supplemental disclosures, Crist, through her counsel waited until September 8, 2015, merely three days before objections were due and less than two weeks before the Final Approval Hearing, to request via e-mail that that the parties turn over all of the discovery in the case.   In her email, Crist does not provide proof of ownership, explain why she is entitled to such discovery or describe what discovery she specifically needs.   Three days later, Crist filed the instant objection complaining that she had not received any discovery or response to her September 8 email.   As an initial matter, "[c]lass members who object to a class action settlement do not have an absolute right to discovery.   *In re Celexa and Lexapro Marketing and Sales Practices Litigation*, MDL No. 09-2067-NMG, 2014 WL 2547543, at *4 (D. Mass. 2014) (citation omitted); *In re Lupron Marketing and Sales Practices Litigation*, No. MDL 1430, Civ. A. 01-10861-RGS, 2005 WL 613492, at *2 (D. Mass. 2005).   "Instead, the Court has the discretion to limit discovery to matters that will 1) ensure that objectors have a meaningful right to participate in the fairness hearing and 2) aid the Court in evaluating the fairness of the settlement agreement."   *Celexa*, 2014 WL 2547543, at *4.   A court will only grant discovery to an objector where the court itself is unconvinced that the settlement is fair. *Lupron*, 2005 WL 613492, at *4.   "Discovery should be minimal and conditioned on a showing of need, because it will delay settlement, introduce uncertainty, and might be undertaken primarily to justify an award of attorney fees to the objector's counsel."   *Id.*   Here, Crist is entitled to no discovery because her request is untimely, overly broad and she has failed to demonstrate any credible reason why the Settlement is unfair, as set forth herein.

[25] McLanahan states in his September 13, 2015 letter that he owned 1,000 shares of Covidien stock. Yet still fails to provide any actual proof that he ever owned the shares or that he held them at the relevant time.   Thus, his half-hearted attempt to demonstrate proof of ownership must fail.

costly and burdensome and, thus, fails to satisfy due process; (2) Covidien shareholders "appear to receive no measurable benefit" from the Settlement; (3) the scope of the Release is too broad; and (4) Plaintiff's request for attorneys' fees should be scrutinized.  As set forth below, both are without merit.

Due Process –   The Court entered an order preliminarily approving the proposed Settlement and Notice and Notice program on May 19, 2015.  Plaintiff and its counsel have complied with the Court's Preliminary Approval Order.   In connection with the proposed Settlement, the notice administrator disseminated 460,554 Notices to nominees and shareholders during the period July 2, 2015 through September 3, 2015.[26]   The Notice disseminated to potential class members to alert them of the pendency of this class action and Settlement mirror those used in virtually every securities class action in the country for the past several decades and indisputably complies with Rule 23's due process requirements:  it satisfies the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all [class] members who can be identified through reasonable effort;" Rule 23(e)(1), which requires that notice of a settlement be disseminated in a "reasonable manner;" and due process, which requires that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  *See also* Fraga Affidavit; Plaintiff's Motion at 4-5, 15-16.

Out of more than 460,000 notices sent out, not one single Covidien shareholder, other than McLanahan, has objected to the purported cost and/or burden of objecting.  In any event, in response to McLanahan's correspondence and objection, counsel for the parties agreed not to

---

[26] *See* Fraga Affidavit, ¶ 6.  Dkt No. 51-1.

challenge his objections on grounds related to the method of service of the objection, nor his failure to appear at the Settlement hearing.

No Measurable Benefit – Mr. McLanahan makes the general statement that the Settlement does not provide Covidien shareholders with any "measurable benefit" to justify the "substantial rights" Covidien shareholders are giving up in the Settlement," yet provides no specific grounds for his objections.   Thus, yet again, McLanahan fails to comply with the specific requirements of the Notice, which requires that an objector provide "the grounds for such objections" in order to provide Plaintiff with the necessary information needed to adequately address the objection.   Accordingly, McLanhan's objection should be separately disregarded on that ground.   Plaintiff's counsel offered to speak with Mr. McLanahan telephonically to understand the nature of his objections to ensure all of his questions were answered but he flatly refused.  McLanahan Objection Ex. C.  As detailed above in Section I.A., *supra*, the Settlement provides Class members with a material benefit that fully justifies the release of claims.

Overbroad Release – As set forth above in Section I.C., *supra*, the Release is not overbroad and has been narrowly tailored to release only those claims that Plaintiffs' investigated related to this Transaction, while specifically carving out other pending litigation. Moreover, Plaintiffs and their experts have fully evaluated the value of the claims being released and the value of the Supplemental Disclosures that serve as the basis for the Settlement.

Attorneys' Fees – Mr. McLanahan, again, does not appear to object to the amount of attorneys' fees requested, nor does he provide any specific grounds for objecting to the amount of attorneys' fees sought.  Rather, he simply requests that the Court examine the fee request with scrutiny, which the Court is already required to do under Fed. Civ. P. 23.  As set forth in

Plaintiffs' opening brief, the requested fees were agreed to among the parties who were in the best position to, and did, weigh the benefits and risks of further litigation and the results achieved.  Moreover, Plaintiffs' requested is reasonable when considered in light of fee awards in similar cases.[27]

## III.  The Graham Newhouse Objection

Mr. Graham Newhouse submitted an objection to the Court on August 21, 2015 (the "Newhouse Objection").  As stated in Plaintiff's Motion (footnote 3), Mr. Newhouse's objection is purely administrative in nature and relates solely to the tax withholdings of the Merger consideration paid to him.  Specifically, Mr. Newhouse objects that U.S. taxes were improperly withheld from the cash portion of the Merger consideration that he received and that the Release of claims may bar him from recouping those taxes.  Mr. Newhouse's concerns are unwarranted.  As set forth in the Stipulation, the Release only applies to claims related to the transaction, itself, and Mr. Newhouse's status as a Covidien shareholder with respect to those claims.  It does not extend to claims regarding U.S. tax withholdings, nor did the parties intend for the Release to extend to a shareholder's status as a taxpayer.  Accordingly, it is the parties' position that the Release does not, in any way, extinguish Mr. Newhouse's right or ability to seek a refund of taxes withheld from the U.S. Internal Revenue Service.  Plaintiff's counsel have opened a dialogue with Mr. Newhouse and explained the nature and extent of the Release and steps Mr.

---

[27] McLanahan appears to criticize the parties for not issuing the Supplemental Disclosures in sufficient time to consider them before the shareholder vote.  The Supplemental Disclosures were issued 13 days before the vote.  Applicable SEC rules and courts have found that as few as five days is sufficient notice.  17 C.F.R. § 240.14e-4(e)(3)(i) (2006); *See Martin Marietta Corp. v. Bendix Corp.*, Del.Ch., C.A. 6942, Brown, C. (Sept. 19, 1982) (11 days and 9 days held adequate to consider supplemental disclosures before stockholder vote); *Electronic Specialty Co. v. International Controls Corp.*, 2d Cir., 409 F.2d 937 (1969) (8 days); *Nicholson File Co. v. H.K. Porter*, D.R.I., 341 F.Supp. 508 (1972) (7 days); *McDermott, Inc. v. Wheelabrator-Frye, Inc.*, 649 F.2d 489, 493 (7th Cir. 1980) (6 days); *Pabst Brewing Co. v. Kalmanovitz*, 551 F. Supp. 882, 895 (D. Del. 1982) (4 business days); *In re Dataproducts Corp. S'holders Litig.*, C.A. No. 11164, 1991 WL 165301, at *7 (Del. Ch. Aug. 22, 1991) (specifically rejecting a claim that eight days was too short a time for information to reach stockholders, finding that "that contention finds no support in the law.").

Newhouse should take to recoup any income taxes improperly withheld from him as a non-U.S. citizen.[28]   Counsel is continuing to work with Mr. Newhouse to help him obtain the withheld taxes.   Accordingly, the Court should disregard the Newhouse Objection because it is without merit and has been resolved.

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court approve the proposed Settlement and enter the [Proposed] Final Judgment Order, attached as Exhibit D to the Stipulation.

Respectfully submitted,

Dated:  September 16, 2015                    **BLOCK AND LEVITON, LLP**

By:    /s/Jason M. Leviton
Jason M. Leviton
155 Federal Street, Suite 400
Boston, MA 02110
Tel.: (617) 398-5600
Fax: (617) 507-6020
Jason@blockesq.com

*Liaison Counsel for the Class*

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
1500 Broadway, 16th Floor
New York, NY 10036
Tel.: (212) 682-3025
Fax: (212) 682-3010
racocelli@weisslawllp.com
mrogovin@weisslawllp.com
kkeenan@weisslawllp.com

**LEVI & KORSINSKY LLP**
Shannon L. Hopkins

---

[28] Specifically, Mr. Newhouse must file a non-resident tax return with the U.S. IRS in 2016 in order to obtain a refund of taxes withheld.

31

30 Broad Street, 24th Floor
New York, NY 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
shopkins@zlk.com

*Co-Lead Counsel for the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this motion, filed through the CM/ECF system, will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: September 16, 2015          */s/Jason M. Leviton*
                                              Jason M. Leviton